```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
```

| | |
|---|---|
| ERIC DARDEN, et al.,      ) | |
|                  Plaintiffs,  ) | |
|         v.         ) | 1:19cv1050 |
| GOVERNOR ROY A. COOPER, III, et al., ) | |
|                  Defendants.  ) | |

## MEMORANDUM ORDER

THOMAS D. SCHROEDER, Chief District Judge.

Before the court is Plaintiffs' motion to amend this court's September 14, 2020 memorandum opinion and order pursuant to Federal Rule of Civil Procedure 59(e). (Doc. 26.) Defendants filed a response opposing the motion. (Doc. 27.) For the reasons set forth below, Plaintiffs' motion will be denied.

### I. BACKGROUND

Plaintiffs are the representatives of the estates of three North Carolina prison employees who were murdered at the hands of four inmates during a failed escape attempt. Plaintiffs initiated this action against seventeen Defendants across two state agencies and the state's executive branch, claiming violations of the decedents' Fourteenth Amendment rights under 42 U.S.C. § 1983. On September 14, 2020, the court entered a memorandum opinion and order that granted Defendants' motion to dismiss with prejudice all claims against Defendants North Carolina Department of Public

Safety ("DPS"), Correction Enterprises ("CE"), and their employees named in their official capacities on the grounds of sovereign immunity. (Doc. 24 at 16.) The court also dismissed without prejudice all claims brought against the named Defendants in their individual capacities. (Id.) Judgment was entered on September 15, 2020. (Doc. 25.) Plaintiffs now move, pursuant to Federal Rule of Civil Procedure Rule 59(e), to amend the court's opinion and order to reflect that the dismissal of all claims against DPS, CE, and their employees named in their official capacities be *without* prejudice. (Doc. 26.)

**II. ANALYSIS**

**A.  Legal Standard**

Under Rule 59(e), a court may alter or amend a final judgment for the following reasons: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998); see Fed. R. Civ. P. 59(e). Rule 59(e), therefore, "permits a district court to correct its own errors, sparing the parties and the appellate courts the burden of unnecessary appellate proceedings." Pac. Ins. Co., 148 F.3d at 403 (internal quotation marks omitted). The moving party bears the burden of establishing one of the three grounds for reconsideration. Loren Data Corp. v. GXS, Inc., 501 F. App'x 275,

285 (4th Cir. 2012).  While "[t]he district court has considerable discretion in deciding whether to modify or amend a judgment" under Rule 59(e), Gagliano v. Reliance Standard Life Ins. Co., 547 F.3d 230, 241 n.8 (4th Cir. 2008), the Fourth Circuit has cautioned that "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." Pac. Ins. Co., 148 F.3d at 403 (internal quotation marks omitted).  Litigants may not use the motion "to raise arguments which could have been raised prior to the issuance of the judgment, nor . . . to argue a case under a novel legal theory that the party had the ability to address in the first place."  Id.

  **B. Motion to Amend Judgment**

Plaintiffs make two arguments in support of amendment.  First, Plaintiffs allege that there is a genuine issue of material fact as to whether DPS has waived its sovereign immunity through the purchase of liability insurance.  (Doc. 26 at 5-7.)  Second, they argue that the court committed a clear error of law in determining that CE constitutes a state agency to whom Eleventh Amendment sovereign immunity applies.  (Id. at 2-5.)  Each argument is addressed in turn.

    **1. DPS's waiver of sovereign immunity**

Relying on materials not previously presented to the court, Plaintiffs argue that the court should amend its judgment against DPS to reflect dismissal without prejudice on the ground that DPS

3

waived its sovereign immunity by purchasing insurance through the North Carolina Public Employees Liability Insurance Commission ("the Commission"). (Doc. 26 at 7; see Doc. 26-1.) Plaintiffs contend that DPS "elected Professional Liability Insurance Coverage through" the Commission and that, as the Commission's authorizing statute requires that "insurance premiums [] be paid by the political subdivisions whose employees are covered," see N.C. Gen. Stat. § 58-32-10, "no funds or premiums are paid using resources from the State Treasury of North Carolina." (Doc. 26 at 6–7.) On this basis, Plaintiffs argue, DPS should not be entitled to sovereign immunity. In response, Defendants contend that Plaintiffs cite no support for their argument that the purchase of insurance would waive sovereign immunity. (Doc. 27 at 4.) Defendants further argue that the insurance policy at issue does not apply to DPS. (Id. at 5.) After review, the court finds Plaintiffs' arguments meritless.

First, Plaintiffs' contention that no funds or premiums are paid from the state treasury to purchase liability insurance necessarily fails. As discussed in this court's prior opinion, DPS is an agency funded directly by the North Carolina state treasury. (See Doc. 24 at 6.) But second, and more importantly, as Defendants correctly point out, Plaintiffs not only cite no authority to support their contention that the purchase of insurance through the Commission would result in a waiver of

4

sovereign immunity in this case, the statute upon which they rely expressly precludes their claim. The Supreme Court has emphasized that the test for determining whether a state has waived immunity is "a stringent one." Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985). "A state statutory or constitutional provision will be found to constitute a waiver of Eleventh Amendment immunity only when it 'specif[ies] the State's intention to subject itself to suit in federal court' in 'the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.'" In re Sec'y of Dep't of Crime Control & Pub. Safety, 7 F.3d 1140, 1145 (4th Cir. 1993) (quoting Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 305–06 (1990)). Plaintiffs rely on N.C. Gen. Stat. § 58-32-10, which outlines the powers and duties of the Commission in acquiring insurance policies for political subdivisions of the state, to support their argument that funds from the state treasury are not involved in this case. However, the same statute provides that "the purchase, by any State department, institution, [or] agency . . . of professional liability insurance covering the law-enforcement officers, officers or employees of such department, institution, [or] agency . . . shall not be construed as a waiver of any defense of sovereign immunity by such department." See N.C. Gen. Stat. § 58-32-15(c) (2020). This clear disclaimer defeats Plaintiffs' argument that sovereign immunity was waived

5

through any purchase of insurance. Moreover, Plaintiffs have pointed to no portion of the insurance policy that would allow for coverage of DPS (or CE, for that matter). Plaintiffs' motion to amend on these grounds will be denied.[1]

### 2. CE's sovereign immunity

Plaintiffs next argue that the court should amend its judgment against CE to order dismissal without prejudice, claiming a clear error of law. In order to amend a judgment due to an error of law, the prior decision must be "dead wrong," not "just maybe or probably wrong; it must . . . strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish." TFWS, Inc. v. Franchot, 572 F.3d 186, 194 (4th Cir. 2009).

Previously, the court concluded that CE is a state agency entitled to sovereign immunity because its funds are held by the state treasury. (Doc. 24 at 6–7.) As any judgment against CE would therefore be paid from the state's treasury, the court found that CE is entitled to state sovereign immunity. See Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 49 (1994) ("[T]he state treasury factor is the most important factor to be considered . . . and, in practice, [courts] have generally accorded this factor dispositive weight." (internal quotation marks omitted)).

---

[1] This is consistent with existing case law. See, e.g., Biggs v. N.C. Dep't of Pub. Safety, 953 F.3d 236, 242 (4th Cir. 2020) (finding immunity).

6

Defendants maintain that this conclusion was correct and that CE is entitled to sovereign immunity because any judgment against CE would be paid from the state treasury. (Doc. 27 at 6-7.) Plaintiffs, however, now contend that any judgment against CE would not be paid from the state treasury because CE is a "self-supporting operation." (Doc. 26 at 3.) In light of this new argument, the court will reexamine whether CE is properly considered an arm of the state for purposes of sovereign immunity to ensure the prior judgment was not a clear error law.

The Fourth Circuit applies four non-exclusive factors when determining whether a state-created entity functions as an arm of the state for the purposes of sovereign immunity: (1) whether any judgment against the entity as a defendant will be paid by the state or whether any recovery by the entity as a plaintiff will inure to the benefit of the state; (2) the degree of autonomy exercised by the entity, including who appoints officers, where funding derives from, and whether the state retains a veto over the entity's actions; (3) whether the entity is involved with state concerns, rather than non-state concerns; and (4) how the entity is treated under state law, including whether the entity's relationship with the state is sufficiently close to make the entity an arm of the state. See U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 804 F.3d 646, 650–51 (4th Cir. 2015).

The first factor is typically considered to be the most important. Hutto v. S.C. Ret. Sys., 773 F.3d 536, 543 (4th Cir. 2014).

In relation to the first factor, Plaintiffs correctly point out that CE is designed to be a self-supporting agency. See N.C. Gen. Stat. §§ 148-129, 148-130 (2020). By statute, CE shall "[g]enerate sufficient funds from the sale of goods and services to be a self-supporting operation." Id. § 148-129. However, this alone does not mean that the state treasury would not be liable for judgments against CE. See S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc., 535 F.3d 300, 305 (4th Cir. 2008).

Revenues from the sale of goods manufactured or produced by CE are deposited with the State Treasurer and kept in a special revolving working-capital fund. N.C. Gen. Stat. § 148-130(a). These revenues are then applied first to "capital and operating expenditures, including salaries and wages of personnel necessary to develop and operate [CE] and incentive wages for inmates employed by [CE]." Id. § 148-130(b). Of the remaining revenue, five percent is credited to the Crime Victims Compensation Fund, and the rest is either "used for other purposes within the State prison system or . . . transferred to the General Fund." Id. Therefore, by statute, CE's revenues are both retained by the state treasury and are regularly disbursed for the benefit of the state, either for use within the state prison system or by contributing to the state treasury's general fund. Collectively, this suggests

8

that CE – although self-supporting – generates revenue that is held by the state treasury for the benefit of the state. Thus, any damages paid by CE would be paid by the state treasury from state resources. The first factor therefore weighs in favor of finding CE to be an arm of the state.

Plaintiffs have not made any argument pertaining to the remaining three factors. However, from CE's governing statute and its annual reports, these factors appear to support the same conclusion. At least in terms of funding, the second factor weighs in favor of designating CE an arm of the state. Although nominally self-supporting, CE's funding largely derives from state sources. By statute, CE's products are given preference by state institutions. See id. § 148-134. "No article or commodity available from [CE] shall be purchased by any State department, institution, or agency from any other source unless the prison product does not meet the standard specifications and the reasonable requirements of the department." Id. This preference is of significant consequence to CE's annual sales. In 2016, over 90 percent of CE's sales were made to state agencies, with the vast majority being made to DPS. See Correction Enterprises, 2016 Annual Report 15, https://www.correctionenterprises.com/about/publications/annual_report_2016.pdf (last visited Dec. 30, 2020) (showing that DPS constituted 63 percent of CE's 2016 sales while "other state

9

agencies" constituted another 30 percent); see also Hoover, 535 F.3d at 305 (finding funding derived from the state where state agencies were required by law to purchase insurance premiums from the entity and explaining that "through its yearly appropriations to state agencies, which in turn are required by law to remit premiums to the [entity], [the state] provides significant funding for the [entity's] . . . funds"). Because CE's funds derive primarily from state sources as a result of the mandatory preference imposed by state legislation, the second factor weighs in favor of finding CE to be an arm of the state.

Similarly, the third factor — addressing state concerns – weighs in favor of considering CE an arm of the state. Among CE's stated purposes are "[p]rovid[ing] incarcerated offenders a work and training environment that emulates private industry [and] . . . training opportunities that allow them to increase work skills and employability upon release from prison." N.C. Gen. Stat. § 148-129. Another stated purpose is to "[a]id victims by contributing a portion of its proceeds to the Crime Victims Compensation Fund." Id. These concerns — the training and rehabilitation of prisoners, and the compensation of crime victims — are state, rather than local or private, concerns. As such, this factor weighs in favor of considering CE an arm of the state. Similarly, the fourth factor weighs in favor of this conclusion. Because the state requires CE to hold its funds in the state treasury and to disperse

its excess annual revenue either to the state prison system or the treasury's general fund, CE is treated as part of the state under state law.

Taken together, these factors support the court's prior holding that CE is an arm of the state entitled to sovereign immunity. Consequently, the court declines to amend its earlier judgment, and Plaintiffs' motion to amend on these grounds will be denied.

**C.    Request for Extension of Time**

As a final matter, Plaintiffs' motion requests "a stay and extension of any and all statutes limiting Plaintiffs time to file a new or amended petition/complaint" and seeks a 30-day extension from the date of this ruling to file a new petition for relief or to amend their previous complaint. (Doc. 26 at 8.)  Defendants contend that that request should have been "set out in a separate pleading." (Doc. 27 at 8 (citing M.D.N.C. L.R. 7.3(a)).)  Further, Defendants argue that Plaintiffs have not articulated any specific justification for granting a stay and extension.  The court agrees.

Plaintiffs have not provided a justification for their request.  The court therefore lacks a reasonable basis to conclude that good cause exists to support such relief.  See Fed. R. Civ. P. 6(b)(1) ("When an act may be done within a specified time, the court may, for good cause, extend the time.").  As the court has found Plaintiffs' arguments for amendment to be without merit, it

11

does not otherwise find good cause for an extension. The request for an extension will be denied.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Plaintiffs' motion to amend judgment (Doc. 26) is DENIED.

       /s/   Thomas D. Schroeder
    United States District Judge

December 30, 2020